May it please the Court, good morning. I'm Kevin Viena, Deputy Attorney General for the respondent on the petition below, and we are the appellate in this matter. I hope to make four points for the Court of Argument this morning, and respond to any questions the Court may have. The four points are essentially this. This is a case that is governed by the standard of review set forth in the AEDPA. That is, a deferential scheme for reviewing state court judgments. AEDPA applies in this case because the Court of Appeal, the California Court of Appeal, decided this issue on the merits. Does it apply not only to the finding of error, but also to the finding of harmlessness? I would say it's the reason I say it, I think my inference is understood, but just to make sure that it is. The magistrate judge, and then I assume the district judge agreed with this footnote, the magistrate judge holds or recommends a holding that because the California Court of Appeal applied the wrong standard as to harmlessness, that the Federal judgment as to harmlessness under Brecht is just an ordinary Brecht standard. Do you agree that Brecht is or is not the standard? Where are you on that point? I agree that Brecht might be the standard. Might or is or isn't? Well, I think it is not the standard because I think the fundamental question, the question for this Court to decide is whether the California Court's determination that there was no constitutional error, that is, that in the context of this actual defense. Oh, assume for the moment. I'm not asking you to concede. Assume that there is constitutional error. What's the standard by which we would then judge harmlessness? Is it Brecht? It is Brecht. Okay. And although one of my colleagues made a, an argument, sort of a weak argument at one point that the California Court had made a determination under Chapman, it clearly had not. It did not. Okay. So Brecht, if we get to that point, Brecht is the standard. Correct.  Thank you. But the Court did expressly decide the issue of whether there was constitutional error in the exclusion of an increment of additional propensity evidence. And that's all we're talking about, an increment of additional propensity evidence. AEDPA applies. The California Courts applied the correct rule. That is, the rule that derives from the Supreme Court decisions in Washington versus Texas and Chambers versus Mississippi. That rule, however, has never been explicated by the United States Supreme Court in what could be called a clear or line-drawing fashion. The rule is at best general, as this Court has recognized in Arradondo versus Ortiz. The best that can be said about that rule is that the exclusion of defense evidence that is central, and these are words used by the Supreme Court or by courts, federal courts of appeal that have addressed it, central, critical, crucial, indispensable to the defense may rise to the level of a due process violation. It is important that that is a general rule. The rule is of general application because, as the United States Supreme Court said recently in Yarborough versus Alvarado, when a state court applies a general rule, that state court should be given even more leeway in the application of that general rule to the facts of the case. And then finally, the decision by the state court that there was no constitutional violation was reasonable under the facts of this case. That is, the California Court of Appeal, after it decided that, after it stated that there was no constitutional violation, spent the next approximately five pages, pages, I think they're in the record, ER 18 to 22, explaining why this additional increment of propensity evidence was not central to the defense that was presented in this case. But this additional increment of propensity evidence, as you put it, was the most direct scientific and factual evidence that the victim was presently, at the time of the altercation, under the influence of methamphetamine and what that effect would have on his conduct. Yes, Your Honor. I agree. And that's why the California Supreme Court, or that's why the California Court of Appeal found that the evidence was both relevant and not cumulative. But you don't think it's central, crucial, or critical. No, I don't. And here's why it wasn't central, crucial, or critical. Propensity evidence might make a difference in a case where a defendant who shoots in the exercise of self-defense or unreasonable self-defense, that propensity evidence might make a difference if the defendant in his defense indicates that he's responding to some ambiguous or uncertain provocation or some uncertain event arose that caused him to fear. But that's not what this defense was at all. This was a defense to an actual attack. I reread this morning all of Mr. Cortez's testimony on direct and the follow-on, but really the direct is all that applies to. Mr. Cortez says that he shot Mr. Knoll. He says he shot him four to seven times. He actually shot him ten times. He said that he shot him only because after Mr. Cortez had returned to his bedroom, Knoll entered and first picked up a weapon. Mr. Knoll picked up the .22 caliber rifle and began to point it at Cortez. Cortez's defense was that he took that weapon from Mr. Knoll and that he turned the weapon on Knoll and then shot him, and shot him only as Knoll continued to advance. So propensity didn't matter. Also, if you look at his- If there were one bullet, he'd have a lot more to talk about. He might. Correct, Your Honor. If there had been only one bullet, there might have been. But that's not what happened in this case. Instead, and that's why the California Supreme or the California Court of Appeals determination was reasonable. They indicated that propensity was not the matter on which this case was. It wasn't the issue in this case by any means. There was no question that Mr. Knoll was a violent man. And this was- Let me give the contrary to that. I don't disagree with what you're saying, but what a clear finding scientifically presented to the jury that it was on methamphetamine would produce is not merely that there was an attack, but people on methamphetamine are quicker, more violent, stronger. I mean, it could very well be a different kind of an attack. And if Mr. Cortez was right, because he said, I thought he was on meth, he had more reason to fear if Mr. Knoll was on meth than if the very same Mr. Knoll was not on meth. Would you agree with that? Perhaps. Perhaps. Perhaps you agree with that or perhaps- No. I think there could be a reason. What's missing from the syllogism there is there's no evidence that Mr. Cortez believed that Knoll was especially dangerous this morning. But there's evidence, there's direct testimony from Mr. Cortez that he thought he was on meth. Yes, there is. And if I'm right then that someone is familiar with the behavior of someone on meth, that is to say the same person on meth is more dangerous than the same person not on meth, then if that's true, number one, that he was on meth, and number two, that Mr. Cortez believed it. He had reason to believe that he was actually confronting a different person, depending on whether he was or was not on meth. Isn't that right? Yes, with this one exception, and that is Knoll's, or Cortez's testimony was that Knoll was always on meth. He was on meth earlier when he beat them up. He used meth essentially on each occasion when they were together. But wasn't there testimony that some, at least one or two of the witnesses, had not observed the victim use meth that day? In fact, was the girlfriend just trying to keep him off meth so he wouldn't violate his probation? There was evidence elicited by the defense from two prosecution witnesses, McCombs and Richardson, that suggested they didn't believe he was under the influence of methamphetamine that day. One indicated that she had not seen him use methamphetamine. One indicated sort of ambiguously that she didn't believe he was on. And in addition, there was an inference that could be drawn from the testimony of the medical examiner that there were no needle marks, no fresh needle marks in Mr. Knoll, that was suggestive that perhaps he wasn't, although that evidence was. But Ms. McCombs' testimony was actually a little stronger than that. It was, as Judge Nelson indicates, she says, I was trying to keep him clean so he'd be okay on parole. Yes, but. And I was with him most of the day. Yes. And was there argument to the jury by the prosecutor that there is evidence that he was not on meth? The prosecution did not argue. It wasn't part of the prosecution's case that he was or wasn't on methamphetamine. It was part of the defense case. That is, the defense counsel said he was hyped up. But that was a relatively brief argument. And probably a relatively brief argument because he had not been allowed to put in the scientific testimony? I don't agree with that. And here's why I will say that. I think there are, besides Mr. Cortez's testimony, in which he never really said that I believe Knoll was irrational or especially dangerous or out of control. In fact, all he said was, I walked into the room trying to get some separation between us. I walked into my room, and as I was trying to put my pants on, I turned around, and Mr. Knoll was in the room with my .22 rifle, my .22 pistol grip rifle in his hand, and he was beginning to point it at me. So he was responding, if anything, if that happened, to an actual attack. And the problem with that defense was that his own witnesses didn't suggest that it – his own witnesses who could see into the bedroom proved that that wasn't true. But the reason I say that the – I'm sorry. The testimony of his own witnesses proved it wasn't true? Oh, I think it proved it wasn't true. Both Mr. Freetley and Mr. Lauterbach, who were called as defense witnesses, could see into the bedroom. Both of them said – or one of them said that he saw Mr. – he saw Mr. Cortez enter the bedroom and begin to what he thought was load a weapon. So Cortez had the weapon in his hand initially. He was the first to find himself, as the California Court of Appeal found, I think, as a matter of fact. He was the first to arm himself. And was that Mr. Lauterbach's testimony that he thought he was beginning to load a weapon? Yes. And it was Mr. Lauterbach that thought he had a shotgun, which is not true. He did not have a shotgun. That's correct. Lauterbach said shotgun. Now, we don't know what Lauterbach's expertise was with weapons, but he said that he saw him loading the weapon. And Mr. Cortez's testimony is that he picked up one and then he picked up the other. So it's entirely possible that he might even have broken down the – pulled it out of the case, broken it down, decided he didn't have enough time. I'm not sure that there's a conflict in the testimony between Lauterbach and Cortez. I think there is a direct controversy between them. Mr. Cortez says that he picked up the shotgun, which he knew was unloaded, walked into the bedroom and threw it on the bed. And he said then that he turned around and Cortez had a weapon in his hand, that Cortez had a weapon in his hand. But I would add that I think what further demonstrates that this was not central to the defense is the way it arose. It appears that it wasn't part of the opening statement in any way, because it was the prosecutor who first raised this issue shortly before Cortez testified. He said, I believe the defense is going to seek to introduce some evidence that he was – that he had methamphetamine in his bloodstream. It was – the proffer was highly informal. Defense counsel said, yes, we want to show that he had methamphetamine in his bloodstream. And nothing – it wasn't in writing, there wasn't an eliminating motion, and there was nothing about the effect at that point. It was only later in the trial that he added he wanted to talk about an expert who would say that the offense might increase – might provide an increased propensity towards violence. Excuse me. So it was both – it was both informal and incomplete when it was first made. And then it was incomplete in terms of the defense that was made. Mr. Cortez never said that he was – that he was responding to an irrational or excited behavior. And there was – so the trial court – the trial court said, and the California Court of Appeals said, propensity and additional propensity was not going to – was not a central issue to the defense or to this trial. The prosecution – the prosecutor in his argument said, if things happened, as Mr. Cortez said, that is, if Noel followed him into the bedroom, Noel was first to arm himself. He disarmed Noel and then fired at him only as Noel continued to advance. This case is over, and you should have quit. But that's not what the defense was – or that's not what the evidence showed in this case. Mr. Cortez argued actual – an attack – a defense against an actual attack, not against some imminent attack, but an actual attack. And he said that he shot a couple of times and only as – only as Noel continued to advance. But his own witnesses said, no, Noel armed himself. There was no evidence from anyone other than Cortez, other than – of this struggle to remove the weapon. That – there was no evidence of that. There was one shot that occurred shortly or immediately – were the terms that you – that were used to describe it. Shortly or immediately after Noel entered the bedroom. And Lauterbach and Friedli both said quite clearly that Noel fell to his knees after the first shot was fired. Was that shot fatal? We don't know. We can't tell for sure based on – based on the forensic evidence. But it seems unlikely that it was fatal. There was only one of the – only one of the bullet wounds had GSR presence or other presence that suggested it occurred with – that the muzzle was within one to two feet of the wound. And there's only one bullet that was horizontal in its trajectory? Yes. And that – and the bullet that's horizontal, the one that goes with the neck, that's the one that has the residue? I think that's correct. Although what I would have to say is that that's not crystal clear. I think it's not crystal clear because that's not – it's not an issue that's litigated greatly at trial. Okay. But as I recollect – as I recollect the evidence of the trajectories of the bullets, there's one that's more or less level through the neck. There's one that's a down – a downward trajectory. And then the remainder are on an upward trajectory. They seem to be. I think that is – I think that is essentially correct. How did the downward trajectory occur? Probably the first shot after Mr. Cortez – I mean, you're asking me to speculate, but I would say it is the first among the series of four shots that follows. That is, there's the first shot that puts Mr. Noel to his knees, and then there are some shots. Cortez apparently may be up on the bed at that point. There are a series of four shots that follow. One of those four is the one most likely to have been a downward trajectory. And the downward trajectory shot was fatal? There were three. There's testimony that it was fatal. Yes. Testimony that three of the 11 shots were fatal, but I think importantly, none of them – the only evidence on fatality was that death would have occurred within minutes from any of the three fatal shots. And the reason I suggest that is important is because the district court erected a new defense in this case. That is that he may have been dead after the first shot. The magistrate judge said he may have been dead after the first shot, so we don't care if he shot 10 more times when there clearly was no imminent threat. I was interested in that statement in the magistrate judge's report. Does the same rule of law apply when someone is not yet dead in the sense of no longer breathing but is mortally wounded and will inevitably die within a minute? The law on that would be whether the defendant honestly and reasonably, to have a full self-defense, honestly and reasonably believed that the threat was still imminent or to have an incomplete defense, that is, a defense that would reduce murder to manslaughter, I mean, excuse me, honestly believed it. Are you taking issue then with the California Court of Appeals' statement, the evidence here was not merely relevant. It had unique probative value. Doesn't that get into the factual arena? I don't take issue with their statement that it was unique. I take issue with the inference drawn by the district court that unique means important. Well, we kind of looked through what the district court did, and if we look at what the California Court of Appeals did, it seems to me it's saying this was critical evidence for the defense, and from that then they got to the position it was not prejudicial to exclude it, but it was error to exclude it. I must disagree with that characterization. The California Court of Appeals had two functions in resolving this issue on appeal. One is the general instructive function that an appellate court has of telling courts how to deal with matters in the future, and they said this was relevant because propensity evidence is relevant when there's a self-defense case, and it was not wholly cumulative because it was the only objective evidence on this issue. But then they spend the next five pages explaining why this wasn't central or critical, and I believe that the Watson harmless error analysis is engaging in just that. It is the same analysis. You know, why don't we ñ we're not going to cut you off in the rebuttal. Why don't we hear from the other side, and then we'll hear from you again, but we're not going to make anybody sit down before they're finished. Thank you very much. Thank you. Good morning. Elizabeth Moustakian, appearing on behalf of Petitioner and Appellee Richard Cortez. If the appearance of justice is in the eyes of a beholder, then there has been no appearance of justice in the eyes of any beholder in this case, given that he has been sentenced to 40 years in life, which at his age and given California procedure right now with regard to life sentences, he will never come out of prison based on a decision by a court to exclude evidence that was critical, central, crucial, and indispensable evidence. Now, let me ask you about the sentence. I noticed the California court of appeal reversed as to a firearm enhancement, but I wasn't unable to trace out what that meant in terms of any resentencing. What they did was the sentencing court had imposed not only the 25-year enhancement under 1202.53, but also the 10-year enhancement. And what the court of appeal or what it did was run it, I think it was concurrent, or it stayed it rather than striking it. And what the court of appeal ordered was that that 10-year sentence that was stayed be stricken. I see. So it had no practical consequence. It had no practical consequence in terms of the sentence. He is serving a 40-year-to-life sentence. For second-degree murder. For second-degree murder with a firearm. The 25-year enhancement pursuant to California penal code section 1202.53. This is not a case in which there's been a minor exclusion of evidence, as argued by appellant. But most importantly, an issue that is not addressed by appellant, which I think is the crucial issue, and it was not addressed except for really a very minor passing reference by the court of appeal, is the fact that two-and-a-half hours after the jury began deliberations, it very specifically asked for the methamphetamine or the drug level of the victim, Joel Noel. Now, we know that scientific evidence, because two blood tests were taken, would have shown that he had 1,462 nanograms per milliliter of methamphetamine and 250 nanograms per milliliter of amphetamine. Now, did the jury know that a test had been done, and they just didn't know what the result was? I mean, that's an odd question, if they don't know that a test was done. I don't believe they knew that a test was done. I think what they knew was that Richard Cortez had had a test done. And so they asked what was the drug level. There had been an autopsy. Presumably, they may have determined that. There's nothing in the record that shows us that they had been informed that a test had been done.  Okay. And what's important about that, I think, is when you look at the opinion of the Court of Appeal, page 19 of the opinion, where it says, Thus, although the jury's first request for the results of Noel's blood test, its second request for the testimony of McCombs and Richardson in regard to the shooting. And that is the only mention in the opinion of the Court of Appeal about the question asked by the jury. And under a breadth analysis, I think what you look at is not the focus is constantly been by appellant and by the Court of Appeal on the evidence that supported the verdict. But I think under a breadth analysis, what you look at is the impact of the exclusion of evidence, if there was a constitutional error, on the jury's deliberations or on the jury's verdict. And what I ask the Court to consider is the fact that rarely, if ever, certainly not in my experience, have I seen a case where there has been such direct evidence and information about the impact of excluded evidence on the jury than a jury that two-and-a-half hours into deliberations on a fairly lengthy trial asks for the evidence of Joel Noel's methamphetamine. Kennedy. And how long after that question did they come back with a verdict? I'm sorry. I don't know the answer to that question. I'm sure. I think I even knew it at one point, but I can't remember. But after that request, they asked for the readback of the two defense witnesses – I mean, the two prosecution witnesses who testified that there was repeated shooting by your client into Noel. Exactly. And he also made a statement in the questioning forum, are you dead yet? So that came out that way. Right. And to characterize the proffer or the request for this evidence to come in, made by Mr. Scalise, the defense attorney, as informal, I think is really very contrary to the facts of this case and to the representations made by Mr. Scalise as to what Maureen Black would testify to and how crucial this was to the defense case. At issue in the case is the violation of long-established federal law. And when we talk about chambers and when we talk about Washington, I think to say that it applies just to a general law and that it's not a general evidence and that that's not applicable in this case really is very contrary to the evidence. There was three pieces of evidence that Joel Noel was not using methamphetamine that day, and the court very clearly stated when it asked the appellant the question about Ms. McComb's testimony, because she did say she was trying to keep him clean. She was, most importantly, with him most of that day and presumably would have known since she was interested in the issue of whether he was using drugs, would have been very interested had he. There was Polly Richardson's testimony that she was with him, if not all day, she was with him when they came and drove up to the cabin, and then the medical examiner's testimony. So there was evidence elicited by the prosecution in this case that Noel was not under the influence of methamphetamine that day. The only evidence other than Richard Cortez's testimony that Noel was under the influence of methamphetamine would have come from the blood tests in terms of the levels of methamphetamine and from Maureen Black, who would have testified. And that was not merely some additional evidence. It was evidence that would have impeached three prosecution witnesses on questions raised and points made by the prosecution, namely that he was not under the influence of methamphetamine. Did that come in indirect by the prosecution or across? I believe it came in under direct. That being the evidence from Ms. McComb and so on? Yes. And Richardson. Indirect. And from the medical examiner. So it would have directly impeached those three witnesses, and McComb and Richardson are extraordinarily important witnesses for the prosecution whose testimony as to Joel Noel's methamphetamine usage, at least, was completely left unimpeached. So their credibility was not touched because this evidence was excluded. Then there was Richard Cortez's testimony, and this evidence would have corroborated Richard Cortez's testimony. Richard Cortez's testimony that Joel Noel was always under the influence of methamphetamine is not the issue here. The issue is, was Joel Noel under the influence of methamphetamine at the time of this behavior? And that would have corroborated what Richard Cortez said to the jury. We all know that the defendant's testimony to the jury is going to be viewed with some suspicion in a case like this. This was evidence that would have corroborated his testimony, and for that reason, under Chambers, under Washington, this was crucial evidence that should have been presented to the jury. Now, as I understand Cortez's defense, it is basically he was terrified of this man. Absolutely. And good reason to be. He would beat him up. It was only a couple of months before that he was attacked by him with a knife to his head. I mean, he had good reason to be terrified of this man. But let's assume that, and this is obviously contested, but let's assume that Cortez's testimony is correct, that is, not only is he on methamphetamine, which we have confirmed by the medical report, but also when Noel comes into the room, he picks up the .22, the pistol-grip .22. He begins to point it at Cortez. Cortez is able to take it away from him. He then backs away. And now this is the testimony that's now we're getting to the point that's observed by both Lauterbach and by Freetley. He backs away, pursued by Noel, and then shooting. He's in pretty good shape if he shoots him once. He falls to his knees. He's disabled. He then calls the cops and the ambulance. He doesn't do that. Instead, he keeps shooting. His defense, I assume, the best defense he can make is, for the first couple of shots, is, well, I wasn't sure I disabled him. Maybe he says that. His defense thereafter probably would be, and I'm not sure, I didn't quite see this defense either made in his testimony or quite argued, but it is, my blood was up. I was terrified. I didn't know what to do. We know when somebody's blood is up. We have rules about, at least many police departments have rules about, if they've just completed a high-speed chase, if they can get somebody else to do the arrest, it's better because their blood is up and they behave differently, maybe indefensibly. Now, is that workable as a defense for him based upon self-defense that would reduce this from second-degree murder? I think it is. Here's why I think it is. Number one, we don't know. We don't really know which shot was the fatal shot, and we don't know that the first shot that brings Noel to his knees is in any way a fatal shot. We just don't know that. But the second thing is, Cortez's testimony about how frightened he was and the state of mind that he was in was completely, and this is probably not a legal term, but I will use it, it was gutted by the fact that the cause for him being in that fear, the cause in terms of Noel's conduct was not allowed to be presented to the jury. No one saw, not McCombs, not Richardson, not Frietly, not Waterbath, no one saw the beginning of this incident other than Cortez, what Cortez testifies to. But the reality of Cortez's mental state, the reality of how frightened he must be, is corroborated or would have been corroborated by the testimony of Maureen Black, who would have testified as to the conduct of someone who is on this level of amphetamine and methamphetamine usage. Now, as to the number of shots, and I'll just respond briefly to an issue that was raised when an appellant was speaking, as to the number of shots in the court's comment about the magistrate or the district court's comments about that and it being a new defense, it is not a new defense, it is an analysis of the facts, it is an analysis that directly addresses the issue that appellant and the state appellate court brought up in terms of the number of shots. And I think what the district court was saying is, and let me answer your question directly, I think if someone is mortally wounded and additional shots are fired, I think that takes it out of the law of, you know, if you shoot someone who's already dead, that's not murder, or that's not, you know, the additional shots don't matter. So the additional shots do matter. The initial shots do matter. I don't think you can say, well, the person is mortally wounded, and so from anything I do from now on is manslaughter, it's not murder. I don't think you can say that. But I don't think that that's the situation that we have here, and I don't think we know that that's the situation that we have here. The only thing that we know is that the jury was never told what the behavior of someone would be like if they were under the influence of methamphetamine. Kennedy. Let's go back to your, I think your quite laudable and candid admission that if there were additional shots into a gravely injured person, that would not be admissible as self-defense. There's no evidence in this record that I can see, but that Noel was alive when the shots were fired. There's no evidence that he was dead. No, there's no evidence either way. And no, no, no. There was evidence that he was alive until the shots were fired. And when all the shots had finished being fired, there was evidence he was dead. But there was no evidence that he was dead when any shot was fired. Correct? Absolutely. As a matter of fact, Dr. Garber, the expert testimony was that the shots, while fatal, would be fatal within some minutes. Wasn't that his testimony? I think that that was his testimony. But I think that that was also guarded testimony. I don't think that that was, I don't think that that's something that he said was possible for him to determine precisely. I think that I have to go back to the point that I think is the important consideration here as to the reasonableness of the State court opinion and as to whether it was contrary to Federal law. And that was a case, and that is the issue of whether the State appellate court adequately considered the question of the jurors after two and a half hours of deliberations. And I know that this is a point that I have repeatedly raised, both during argument and in my papers, but I think that's because, or it is because I don't think it's a point that can be underestimated in any way. I think it is such a absolutely unique set of circumstances in this case where you have a piece of evidence, or actually two pieces of evidence, the actual blood results and the expert testimony. May I take you back to another aspect of the shooting evidence? Sure. The defendant, Cortez here, if I remember correctly, testified that he did not shoot Nowell after Nowell had fallen on the ground. Right? Yes. There were six bullets with upward trajectories which were consistent, found in the court of appeal, with bullets having been shot by your client whilst Mr. Nowell was feet closest to the door, head closest to the bed, on the ground. If the jury were to find that that evidence impeached the credibility of the defendant, would that not have also carried over as to his testimony, whether he was in fright of Mr. Nowell? Could have. Could have, yes. Let me just briefly summarize, I think, what are the salient points here, that the erroneous exclusion of the blood evidence and of Maureen Black's testimony concerning the impact of methamphetamine on violence-prone behavior had a substantial and an injurious effect on the verdict. And I think it's completely, under the Brecht analysis, reversible. Richard Cortez's state of mind was the critical issue at trial. And, you know, there is something that I want to just point out, and that is the dynamics of a trial. And when a court decides to exclude evidence, evidence which I think Mr. Scalise's impassioned plea to have admitted even after, when he asks to reopen the case, when the jury comes back with that question, which is that it impacts, and I think it's difficult to impasse, to determine the impact for all of us who have done trial work on the dynamics of the rest of the trial. And decisions made. That assumes, of course, that there's some interruption in the flow of the trial and the jury knows what's going on. But unless this was a surprise presented to the trial judge and there's a ruling right there, oftentimes it's done, you know, at recess or at sidebar, a previous ruling. The jury doesn't know. Oh, yeah. I don't argue that the jury knew. What I'm saying is I think this was absolutely a surprise decision. I think as the court of appeal recognizes that this kind of evidence is typically admissible, particularly in a case where they, however you characterize it, it was clearly a self-defense case. What Richard Cortez testified to in the whole defense was a self-defense case. And so this, all I'm saying is this decision to exclude this evidence had an impact on the whole contour of the trial I believe. And that's the point. I'm not saying that it was done in any way in front of the jury. Clearly it was not. Secondly, the importance and proof of the credibility of Richard Cortez, who testified about his fear and state of mind during the confrontation with Noel cannot be ignored, and the testimony of prosecution witnesses was left unimpeached on an issue that the prosecutor had raised, and namely that being the non-usage of methamphetamine by Noel on that day. The importance of this evidence was, again, crystal clear when one looks at the question by the jury, and we ask the Court to affirm the decision of the district court. Unless there are any other questions, I notice I have a minute and 36 seconds left. Roberts. I think no further questions. Thank you. Thank you, Your Honor. If I may, just a few quick points. The Court, you said that you believed it was prosecution evidence that Mr. Noel had not used methamphetamine that day or was not under the influence. Well, it was, as I recollect the testimony, it was on direct testimony that both Richardson and McComb testified that they had not observed that usage. I'd ask the Court to at least reconsider that. Oh, okay. If I'm wrong, please tell me. I refer to my briefing, the appellant's opening brief at page 16. It was Cortez's counsel who drew the information, the only information, about blood testing. There's a blood test or about? Well, first about the fact that blood had been withdrawn from Mr. Noel. Oh, no. My statement was the testimony from both Polly Richardson and from Stacy McComb, my recollection was that they testified on direct that they had not observed methamphetamine used by Mr. Noel and, indeed, that Ms. McComb said, I've been trying to keep him clean. That was not on direct? No. I addressed that in my brief, opening brief on page 16. I'm fairly, I'm quite confident that that was raised by the defense counsel in each case, that with both McCombs and Richardson. And I have sites, references to the excerpts of record there as well. Okay. No, I can check that, but I definitely retract my impression of that, and I will be sure that I make sure that I know exactly what the right answer is on that. Thank you. But I don't believe that's, I don't really believe that's dispositive. Okay. The defense counsel or counsel for Mr. Cortez says that this evidence was indispensable. A review of Cortez's testimony does not lead to that conclusion. While he does say, not often, but he does say at least once that he was afraid of Noel, he was afraid of Noel regardless of methamphetamine in this case. Noel was a tax man who used violence to settle property disputes. He had a property dispute with Mr. Cortez over the truck, so the propensity was there. Noel was an individual who Mr. Cortez knew was violent when he was upset because he had beaten him severely about eight weeks before. Was there any evidence as to whether he was on meth at that time? There is the testimony of Mr. Cortez that he was on methamphetamine at that time, on methamphetamine and drug. In the defense in this case, the defense presented essentially three witnesses on what happened at the cabin. Mr. Cortez doesn't say, I was afraid because he was irrational. In fact, he doesn't say, I was afraid because he was irrational. Lauterbach and Freetley, both of whom had used methamphetamine with Mr. Cortez one or two days before the shooting occurred, neither suggested that Noel was either excited or irrational or on methamphetamine. In fact, the evidence was that Noel entered the home with McCombs and Richardson. He brought beer. He was smiling and calm, according to Freetley, I believe. That there was the discussion outside, within a few minutes after they arrived, Cortez enters angry. Noel reenters, and he is again calm. He either smiles and winks at McCombs and Richardson, or he sits down, as Freetley says. And then no, I think it's Freetley who says he comes in right on his heels. All the other three say that he comes in and sits down. I think there isn't a great deal of time there, but there is no dispute. There doesn't seem to be any dispute that he's not angry. And according to one of the defense witnesses, and I think it's Freetley, he sits down. He's not chasing after him. There's no attack underway at that point. And then the key to the defense is that Cortez responds to an actual attack, not to an imminent threat. So by the time, if this happens, by the time, if this had happened, by the time Noel picks up the gun, the propensity evidence doesn't matter much. Just two final points, if I may, and I thank the Court for its patience with me. Excuse me. You're over so quickly. All right. Only this. The district court applied the wrong legal standard, misinterpreted and said quite clearly on several occasions that the Constitution requires the admission of all relevant material defense or any relevant material defense evidence. They simply got that standard wrong. The issue in this case was whether the California court, which in the four cases that cited principally Cujo, applied Chambers and Washington v. Texas, whether the California court unreasonably determined that this was not central to defense. If it was reasonable to make, if it was not unreasonable to make that decision, then the state court decision should have been upheld. Thank you very much. Thank you very much. Thank you both for very useful arguments on both sides. The case of Cortez v. Garcia is now submitted for decision. We have one remaining case on the calendar for this morning. It is either Dusek v. Mattel or Schiff v. Mattel. I've got two different names in front of me. It is 0-3-0.
judges: T.G. Nelson, W. Fletcher, Bea